Claudio BAUZA, etc., et al.,
Plaintiffs, Appellees,

v.

Arturo MORALES CARRION, etc., et al.,
Defendants, Appellants.

No. 77–1310.

United States Court of Appeals,
First Circuit.

Submitted Dec. 8, 1977.

Decided June 20, 1978.

Jose A. Andreu-Garcia and Geigel, Silva, Soler Favale & Arroyo, Old San Juan, P.R., on brief, for defendants, appellants.

Pedro J. Varela, Hato Rey, P.R., on brief, for plaintiffs, appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This class action under 42 U.S.C. § 1983 was brought in the district court by the parents of Istra de los Angeles Bauza Hernandez after she failed of admission to the kindergarten of the Elementary School of the University of Puerto Rico, Rio Piedras Campus, for the academic year 1976–77. The four defendants are the President of the University of Puerto Rico; the Chancellor of the Rio Piedras Campus; the Dean of the School of Education at Rio Piedras; and the Director of the Elementary School. These officials make up the chain of command over the Elementary School which is operated as a "laboratory school" by the Rio Piedras Campus of the University of Puerto Rico through its Faculty of Education.[1]

Plaintiffs alleged, and the district court found, that the defendants had improperly filled certain vacancies by preferring some children (especially ones from the University community) rather than by selecting by lot from among all qualified applicants. The court agreed with plaintiffs that what was done violated the fourteenth amendment of the federal Constitution. The court ordered defendants to abandon admissions practices favoring students "from a particular group such as the University community," and imposed costs and attorneys' fees of $1,000 upon defendants.

1. Admission to kindergarten, called level one, of the Elementary School, opens up an opportunity to stay at the Elementary School through its various levels and ultimately to progress to a high school which the University also maintains. The parties stipulated that these institutions are "considered to offer the best quality of education through the whole island. . . ."

The questions on appeal are whether the admissions practices as found by the court below amounted to a violation either of the equal protection or due process clauses of the fourteenth amendment of the United States Constitution.[2] The school is publicly-funded, and it is not questioned that the challenged actions constituted "state" action for purposes of the fourteenth amendment and § 1983.

Plaintiff's daughter was one of 102 applicants in March, 1976, for positions in the kindergarten. While a class of 25 was contemplated, five of the children then enrolled in the kindergarten were potential hold-overs as they had not fulfilled the standards of progress to the next level. Thus only 20 new students were then being sought. Of the 102, 77 including Istra survived the initial testing and interview procedure. Of these, 20 were selected by lot in May, 1976, Istra not being among the fortunate ones. Plaintiffs were promptly notified of Istra's bad luck but were not told that other openings might develop for which there would be a waiting list.

Almost immediately after the lottery, the School proceeded to devise a waiting list procedure for filling additional vacancies that were anticipated. Names of the children who had failed the lottery were separated—mainly on the basis of their interviews—into three categories, excellent, good and average, and were ranked by I.Q. within each category. "Excellent" students were to be given priority. Plaintiffs' daughter was not placed on the "excellent" list.

By mid-August eight more spaces had opened up. These vacancies were attributable to promotion of the five potential hold-overs and to a decision to allow three of the 20 picked in May to skip kindergarten. The director thereupon selected seven additional entrants from the thirteen names on the "excellent" list. Selection from this list was not in order of I.Q. The director testified that she chose those students whose parents had reexpressed interest after their initial rejection. An eighth student was selected from the "good" list solely on the basis of being the child of a new teacher at the Elementary School (a preference specified in the School regulation, *see infra*, and approved by the district court). It appears that all except the last child were offspring of professors at the University of Puerto Rico. The net size of the entering class was twenty-five, as planned.

Plaintiffs strongly object to the method used to fill the later vacancies. In particular, they contend that the method did not conform to the School regulation[3] handed Mrs. Hernandez early in 1976 when she picked up admissions forms for her daughter. Entitled "Norms and Procedures for the Admission at level 1 of the Elementary School of the University of Puerto Rico— Year 1976–77", the regulation provides for selection "through aleatory numbers" from a final selection list of qualified applicants, the results of the selection to be conveyed to parents in June. No procedure for filling last-minute vacancies is described. From this, plaintiffs contend that all en-

---

**2.** No separate claims under the law of the Commonwealth of Puerto Rico, as distinct from federal law, have been advanced. While the theory of the court below was mainly that defendants had violated the equal protection clause of the federal Constitution, plaintiffs also argued a due process theory to which the court referred. We consider both theories.

**3.** The authority by which the regulation was issued is something of a mystery. On page 3 was typed, "Office of the Director." Mrs. Rendon, the Elementary School Director, who was appointed late in 1975, testified that she did not know the source of the regulation but "guessed" that as director she approved things given to the public from her office. She further testified that a person in her office "that has done it for years" copied over the regulation every year. Mrs. Rendon did not know who originally wrote it; she felt that to change the regulation would have involved getting together with the kindergarten admissions committee and obtaining approval from the University hierarchy. Notwithstanding the 1976–77 regulation's failure to mention it, she felt that there was an unwritten policy favoring the admission of children of University of Puerto Rico faculty. As one of her jobs as director was admitting children, she also felt that she, together with others on the kindergarten admissions committee, could work out criteria.

trants—including any selected for last minute vacancies—must be selected by lot, and that there can be no justification for the procedure that was followed.[4] Plaintiffs point to the fact that the only express exception in the 1976–77 regulation to selection by "aleatory numbers", is for children of teachers at the Elementary School. Unlike a 1972–73 regulation placed in evidence, the 1976–77 regulation did not expressly allow "[t]he management . . . to admit candidates who qualify after consulting the university authorities." The plaintiffs point to the elimination of this sentence as indicative of a policy against any preference for University children. The School Director testified, surprisingly, that the sentence was eliminated by mistake and that no change in the regulation had been intended.

On the foregoing facts, the district court ruled that "defendants, in adopting and implementing a discriminatory system of admission to the school, violated plaintiffs' rights to the equal protection of the laws," citing *Brown v. Board of Education*, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The court found that plaintiffs' child, having met all eligibility requirements, was "entitled to be considered in the lottery for entrance along with many other qualified applicants." It found a pattern of selection at the School resulting in acceptance of a vast majority of students "from families within the University and only a minority . . . from families outside the University." While plaintiffs had also contended that selection from the waiting list was influenced by political influence, the district court made no finding that this was so, and the record is not such as to warrant our reaching that conclusion on our own.

While there is good reason to criticize the procedures defendants chose to adopt, it is another matter to find a violation of the United States Constitution.[5] The district court acknowledged that under *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the educational right at stake here was not a "fundamental" right for equal protection purposes. But it felt that since Puerto Rico "extends the right of free public school education," thus creating an "entitlement to education" protected by the due process clause, *Goss v. Lopez, supra*, it had to make the right available on completely equal terms. Whatever the abstract merits of this approach, it does not follow the patterns of analysis currently endorsed by the Supreme Court; among other errors, it mixes due process with equal protection standards. In the following discussion, we consider plaintiffs' claim first under the equal protection clause and then under the due process clause.

### 1. Equal Protection

We begin by agreeing with the district court that, once offered, public education must be dispensed within constitutional limits. Under the equal protection clause, however, absent a classification interfering with the exercise of a fundamental right or operating to the peculiar disadvantage of a suspect class, *see Mass. Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), a state's conduct need only bear a reasonable relationship to some proper object. *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1925). Clearly the "right" here affected—to attend this supe-

---

**4.** Neither the 1972–73 nor 1976–77 regulations provide for a waiting list. However, the following provision, found substantially in both versions, can be construed to refer obliquely to such a list when enrollment drops below the norm of 25 students:

"There will be no waiting list neither for Level 1 nor for any other level while the registration per group is not reduced to the agreed norm."

The district court found that the practice of waiting list selection, although carried on in the past, had been abolished since 1973 "according to the school's regulations." The basis for concluding that the regulations had abolished waiting list selection is unclear.

**5.** Whether defendants violated Puerto Rican law is a question not before us except indirectly in connection with plaintiffs' due process claims, *infra*.

rior public school rather than some other— is not a "fundamental" right such as would warrant stricter judicial scrutiny of the classificatory criteria. *San Antonio Independent School District v. Rodriguez, supra.* As the Supreme Court there said, notwithstanding its "abiding respect for the vital role of education in a free society,"

> "the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause." 411 U.S. at 30, 93 S.Ct. at 1295.

Nor is there any claim or evidence that the challenged admissions procedures worked to the disadvantage of a class of persons to which courts have given special protection, such as a racial group, *Brown v. Board of Education, supra*; aliens, *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); women, *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), or the like. The court below thus erred insofar as it may have relied on *Brown* as setting a stricter than ordinary standard for equal protection review here.

■ In the absence of interference with a fundamental right, or impact upon a suspect class, the district court owed a considerable deference to the views and policies of Commonwealth officials. School admissions policies vary widely from institution to institution. No one formulation can be said to be "the only one". If schools are to possess a desirable diversity, officials must retain wide discretion with respect to the manner of selecting students. *See, e. g., Grove v. Ohio St. Univ. College of Veterinary Medicine,* 424 F.Supp. 377, 387 (S.D. Ohio 1976); *Rosenstock v. Bd. of Governors of Univ. of N.C.,* 423 F.Supp. 1321, 1327 (M.D.N.C.1976); *Cortner v. Baron,* 404 F.Supp. 316, 319 (W.D.Okl.1975); *cf. Keys v. Sawyer,* 353 F.Supp. 936, 941 (S.D.Tex. 1973), *aff'd,* 496 F.2d 876 (5th Cir. 1974) (unpublished opinion). Selection criteria

must, perhaps, be broadly rational, but the federal Constitution does not authorize the courts to undertake the business of school or college admissions by dictating what considerations or methods of selection are to be given priority.

■ In the present case, there is no challenge to the admissions procedures outlined in the regulation. Rather, the School's actual entrance practices are attacked as constituting a misapplication of the regulation. But we cannot say that the actual practices lacked minimum rationality in the constitutional sense; at a laboratory school affiliated with a university it is not capricious to prefer university children or to fill some vacancies with children deemed superior to others. Puerto Rico could rationally use a laboratory school to help entice faculty members to settle at the University of Puerto Rico; classifications of children based on impressions of brightness and positive character traits can hardly be called arbitrary.

■ Plaintiffs' strongest argument rests on defendants' having departed from the published regulation. While the regulation might reasonably have provided for the procedures that were followed, it did not. Plaintiffs' equal protection claim comes down to an assertion of the misapplication of public rules. However, the Supreme Court said in *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944),

> "[N]ot every denial of a right conferred by state law involves a denial of the equal protection of the laws . . . . [A]n erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws." *Id.* at 8, 64 S.Ct. at 401.

There must be "an element of intentional or purposeful discrimination" to transform the erroneous administration of a statute [6] fair

---

**6.** In *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 897 (1944), there was an actual state law violation. Here we cannot say whether defendants violated Puerto Rican Law, *see* note 5, *supra,* and in particular we cannot

say what legal effect, if any, is to be given to the regulation. No authority for the issuance of such a regulation is cited to us. It might have constituted simply a policy statement by the director which could be changed without

on its face into a violation of the equal protection clause. *Id.* There was no finding of discrimination of this nature here. At most, the school authorities seem to have been swayed by an unwritten policy in favor of professors' children. By "intentional or purposeful discrimination," the Supreme Court seemingly had in mind not the mere failure to apply a state rule, but some action that would amount to impermissible discrimination were it to be incorporated in and proclaimed by the statute itself. *Id.* at 9, 11, 64 S.Ct. 397. Plainly the actions and motivations challenged here, as found by the district court, are not of this sort: if incorporated in the regulation, they would have passed constitutional muster. To the extent they conflicted with the aleatory process proclaimed in the regulation, they at most constituted violations of Puerto Rican law. *See* note 6, *supra.*

The district court therefore erred in finding a denial of the equal protection of the laws.

### 2. *Due Process*

■ To find a denial of due process, it is of course necessary to find a liberty or property interest [7] of which plaintiffs were deprived without adequate process. The district court referred to the Constitution of Puerto Rico, which makes primary education obligatory, and to the Commonwealth's laws and regulations which provide for free public education, as creating a "right or entitlement to education"; and cited *Goss v. Lopez, supra,* for the proposition that the due process clause protects that right or entitlement "in a proper case." We do not disagree. But plaintiffs' claim does not rest on any contention that their child was being denied a free public education generally. Other schools are available. Indeed, plaintiffs claim no absolute right for their child to attend the University School—their claim boils down to a claim of right to participate in a lottery for the limited number of available places. Nor is this a case where having been admitted to a particular school, plaintiffs' child was suspended or dismissed without being afforded adequate process. *Cf. Goss v. Lopez, supra* (suspension without hearing).

■ On principles of everyday fairness, it is hard not to be in sympathy with the court below. While the school's supplementary selection procedures and criteria, favoring University families and children with allegedly higher intellectual potential, are not per se unreasonable, *supra,* the 1976–77 regulation gave no forewarning that school authorities reserved the right to prefer anyone other than children of Elementary School teachers. When regulations are prepared for public dissemination, responsible school officials should take care that "the rules of the game" are set forth clearly and carefully to protect the hopes and expectations of children and their parents. Obviously this was not done in the present case.

However, we cannot say that the regulations at issue here created a lawful entitlement, the deprivation of which violated the due process clause. It is true that the only method of selection described in the regulations is "selection through aleatory numbers." However, the very next sentence of the regulation provides that, "During the month of June the parents will be notified of the final selection." The strong implication of reading both sentences together is that a particular selection event is being described as opposed to a binding commitment throughout the school year.

The regulation, to be sure, does not address itself at all to the filling of vacancies that may arise after the regular June selection process is over. But these are simple regulations and were never designed to cover all contingencies. As the start of the new school year approaches and after it commences (and parents make alternative plans for their children), a lottery becomes a less and less reasonable method by which to add each additional student to the pro-

---

notice, at least in the absence of reliance, at any time.

7. "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." Amend. XIV, Section 1.

gram as openings occur. We note that while the school did not specifically reserve for itself the authority to use alternative criteria for choosing students after the first selection, it also did not not explicitly deny itself that possibility.[8] We think in general institutions may be presumed to reserve for themselves some degree of discretion in dealing with uncertain contingencies despite the fact that they have committed themselves to a formal and orderly procedure for regular decisionmaking activities. Moreover, if we examine the practice of the school to determine its own interpretation of its regulations, *see United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *cf. Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (explaining the relevancy of institutional practice in establishing the scope of due process interests), we find no support for plaintiffs' position that selection by aleatory numbers is the exclusive method by which new students may be admitted to the program after the initial selection by lot is completed. Finally we think it is clear that plaintiffs cannot be said to have taken any action in reliance on their interpretation of the regulation that post-June admission would be selected by lot. Given the ambiguity of the scope of the regulation on the part of plaintiffs, we cannot conclude that a legal entitlement sufficient to warrant due process protection has been created. Without such an entitlement plaintiffs' cause of action must fail.

The judgment of the district court must be reversed, and the case remanded with directions to dismiss the complaint.

*So ordered.*

---

8. As discussed *supra*, note 4, the no waiting list provision is subject to several interpretations and accordingly is given little weight in our analysis.