ALBA VICÉNS, por sí y en representación de su hijo ROBERTO ALEJANDRO CRUET VICÉNS; RUBÉN ESTREMERA, por sí y en representación de su hijo RUBÉN GUILLERMO, demandantes y peticionarios, *v.* UNIVERSIDAD DE PUERTO RICO, RECINTO DE RÍO PIEDRAS; HAYDEÉ COLÓN ROSA, ETC., demandados y recurridos.

*Número:* CE-86-542    *Resuelto:* 22 de agosto de 1986

*Pedro J. Saade Lloréns* y *José Enrique Colón Santana,* de Servicios Legales de P.R., Inc., abogados de la parte peticionaria; *Lady Alfonso de Cumpiano* y *Juan A. Moldes-Rodríguez,* abogados de la parte recurrida.

Sala integrada por su Presidente, el Juez Asociado Señor Negrón García y los Jueces Asociados Señores Ortiz y Hernández Denton.

RESOLUCIÓN

A la anterior petición de *certiorari,* no ha lugar.

Lo acordó el Tribunal y certifica el señor Secretario General Interino. El Juez Asociado Señor Negrón García emitió voto particular disidente.

(*Fdo.*) Heriberto Pérez Ruiz
*Secretario General Interino*

—o—

Voto particular disidente del Juez Asociado Señor Negrón García.

Este recurso revive en nuestro suelo la concepción platónica —abandonada en el transcurso de la historia de la civilización— de que sólo los "filósofos reyes" son los más aptos para gobernar y educar. Las voces que sostienen hoy que los hijos de los "filósofos reyes" están más capacitados para estudiar, y que por ende, per se son acreedores a privilegios para lograr acceso a una educación pública selectiva, olvidan que en nuestro diseño democrático la "igualdad es ingrediente medular del ideal de justicia que constantemente late en la Constitución". *P.R.P.* v. *E.L.A.*, 115 D.P.R. 631, 633 (1984).

## I

Se cuestiona la negativa del Tribunal Superior, Sala de San Juan, a expedir un *injunction* preliminar y permanente solicitado por Alba Vicéns, madre del menor Roberto Alejandro Cruet Vicéns, y Rubén Guillermo Estremera en representación de su hijo de igual nombre. Éstos formularon demanda en la que alegan que las normas y prácticas de admisión a la escuela elemental de la Universidad de Puerto Rico (Modelo) son discriminatorias e inconstitucionales. Luego de una vista al efecto dicho foro, en lo pertinente resolvió:

> La parte demandante no tiene un derecho constitucional a asistir a determinada escuela en particular y menos aún, tiene derecho a asistir a una Escuela-Laboratorio la cual no se administra con fondos del Departamento de Instrucción Pública por ser un instrumento de aprendizaje, entrenamiento e investigación de la Facultad de Pedagogía de la Universidad de Puerto Rico, Recinto de Río Piedras. La bonificación concedida a los hijos del personal docente y no docente de la UPR-PR cumple un interés legítimo dentro del contexto académico de la Escuela-Laboratorio que justifica tal reglamentación y responde a la necesidad de propiciar el

reclutamiento y retención de personal universitario. En adición, el procedimiento utilizado para la selección de los niños al programa de "Kindergarten", nivel 1-2, de la Escuela Elemental del Colegio de Pedagogía de la Universidad de Puerto Rico, *prima facie*, se reputa válido hasta que no sea declarado inconstitucional, máxime cuando ya otros tribunales han intervenido en la adjudicación de la validez del mismo. Aunque las decisiones de dichos tribunales no son mandatorias, tienen fuerza persuasiva para la jurisdicción local. *Bauzá* v. *Morales Carrión*, 578 F.2d 447 (1978). Véase además lo resuelto en *Regents of the University of Michigan* v. *Ewing*, 106 S.Ct. 50 (1985); *Board of Curators of the University of Missouri* v. *Horowitz*, 435 U.S. 78 (1978) y *Eliseo Gaetán* v. *Universidad de Puerto Rico*, Civil Núm. PE-84-866.

La concesión o denegatoria de una solicitud de *injunction* descansa en la sana discreción del Tribunal y sólo debe concederse con gran cautela y en aquellos casos en que la necesidad y las razones para expedirlo sean claras. *Cerra* v. *Fajardo*, 18 D.P.R. 1024 (1912). *Exhibit* 5, págs. 58–59.

El tribunal de instancia retuvo jurisdicción para dilucidar el caso por la vía ordinaria como sentencia declaratoria.

Ante nos los peticionarios reproducen sus argumentos. En esencia, éstos constituyen un ataque directo al beneficio reglamentario que concede automáticamente cinco (5) puntos o cinco por ciento (5%), lo que sea mayor, al total de puntos obtenidos en las pruebas académicas y sicológicas de los hijos de los profesores, administradores y empleados de la U.P.R. Dicho de otro modo, mediante ese mecanismo, ciertos hijos del personal universitario son favorecidos y admitidos a esa escuela.

El pasado 18 de agosto de 1986, emitimos resolución que concedía a Alba Vicéns término para que expusiera razones por las cuales no deberíamos rechazar su solicitud, en vista de que el resultado obtenido en la evaluación de su hijo Roberto Alejandro de 74 puntos, no alcanzó el índice mínimo de 75 puntos establecido para ser considerado para admisión.

Simultáneamente concedimos a la U.P.R. igual término para que mostrara causa por la cual no deberíamos expedir el auto y provisionalmente ordenar que admitan al menor Rubén Guillermo como estudiante en la referida escuela elemental, condicionada su admisión a las resultancias del pleito.

En cumplimiento de ese dictamen, las partes han comparecido. Expediríamos el auto y en auxilio de jurisdicción, dada la urgencia del remedio, paralizaríamos los procedimientos para evitar que el recurso se torne académico y se frustren los derechos de estos niños a iniciar el próximo lunes sus estudios en el semestre escolar recientemente comenzado.

## II

El Reglamento de la U.P.R. que rige la admisión de estudiantes a la escuela elemental de dicha institución, tiene visos de inconstitucionalidad en cuanto concede *privilegios, distinciones,* y establece *diferencias* en favor de estudiantes hijos del personal de dicho recinto frente a otros niños de la comunidad.

Los niños aquí peticionarios compitieron con la desventaja apuntada. No fueron admitidos a la referida escuela elemental en el presente año escolar 1986–87. Conforme le fuera notificado, se alega que Roberto Alejandro obtuvo una puntuación de 74 puntos, inferior al índice menor de ingreso de 79 puntos, de un máximo de 80 puntos (puede ascender a 85 puntos con el bono de privilegio en controversia). Según la carta, el índice menor de ingreso para el 1986 fue de 79 puntos. Rubén Guillermo Estremera obtuvo una puntuación de 77 puntos. No se necesita mucho esfuerzo ni elucidación para inferir que el bono de privilegio colocó a varios candidatos por encima de los peticionarios, aun cuando éstos, de haber competido en *igualdad de condiciones,* los hubiesen superado. [1]

---

[1] El reglamento establece un procedimiento que exige notificación previa del mínimo de admisión a los padres de los candidatos. Este año el mí-

La situación proyecta, en la dimensión constitucional, una injusticia susceptible de ser remediada judicialmente sin ulteriores dilaciones.

### III

Las secciones primera y quinta del Art. II de nuestra Constitución rezan:

La dignidad del ser humano es inviolable. *Todos los hombres son iguales ante la Ley.* No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, *origen o condición social,* ni ideas políticas o religiosas. Tanto las leyes como *el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.* . . .

. . . . . . . .

Toda persona *tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales.* Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria. . . . (Énfasis suplido.) Art. II, Secs. 1 y 5, Const. E.L.A., L.P.R.A., ed. 1982, Vol. 1, págs. 257 y 271.

El historial de la Convención Constituyente es profuso en cuanto al *repudio* a privilegios, distinciones, diferencias injustificadas, que puedan enarbolarse inclusive en el sistema de educación pública. Varios miembros de la Constituyente dejaron diáfanamente plasmado este sentir. A tal efecto es

---

nimo establecido fue 75 puntos de un total de 80. Sin embargo, aparentemente no se cumplió con el reglamento. No se notificó antes a los padres de la puntuación mínima para admisión. Tampoco está claro que se hubiera seguido el trámite reglamentario de sumar la bonificación tan sólo a aquellos que, además de ser hijos del personal universitario, hubieran alcanzado la puntuación mínima para admisión ese año. Está en entredicho el mecanismo usado para evaluar las admisiones de estos estudiantes.

ilustrativo el siguiente diálogo entre los delegados, Sres. Lionel Fernández Méndez y Jaime Benítez: (²)

    *Sr. FERNÁNDEZ:* A la primera, señor Presidente. En la línea 5, ya sabemos que se insertó la palabra "condición" después de "origen", "origen o condición social". Nosotros hemos leído en la página 6 del Informe de la Carta de Derechos que "origen social", significa que esta expresión reafirma el principio de descartar toda gradación, favoritismo o prejuicio al sopesar los méritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., por motivo de origen o condición social. Esa es la única explicación que aparece aquí en el informe de la Comisión sobre lo que es origen o condición social y da dos o tres ejemplos de en qué situaciones es que este apartado protegería a alguna persona contra otra persona. Ahora, preguntamos nosotros al Presidente de la Comisión y querríamos que nos informara en qué forma se hace válido, *en qué forma se puede proteger ese derecho dentro de la estructura gubernamental que estamos creando con esta constitución, o sea, en qué forma puede una persona que se sienta agraviada por algún discrimen en este sentido, hacer valer su derecho a que no se discrimine contra ella.*

    *Sr. BENÍTEZ:* Más adelante, en las líneas quinta, sexta y séptima, se establece que "tanto las leyes como el sistema

---

(²) Desde mucho antes el señor Benítez sostenía esta visión de vanguardia y civilidad humana. En su discurso titulado *En defensa de la escuela pública,* publicado en J. Benítez, *Junto a la Torre,* San Juan, Ed. U.P.R., 1962, pág. 336, destacó lo siguiente:

"La escuela pública de Puerto Rico puede reclamar para sí el logro preeminente de haber servido al gran ideal cristiano de la igualdad del hombre, de respeto a la dignidad del ser humano, independientemente de los accidentes de raza, sexo, nacimiento o creencias religiosas o políticas. Se ha aprendido en ella más que en ningún otro sitio tolerancia, amor y convivencia.

"Allí hemos acudido todos y nos hemos congregado en torno al mismo salón de clases frente a aquella pizarra de bordes pintados con tizas de colores y el cuadro del Ángelus en la pared. Todos unidos: el hijo del trabajador y el del profesional; el muchacho que venía de la escuela rural a la graduada y lo bajaban de grado; los pudientes y los pobres. Generaciones de puertorriqueños y ciertamente todos los aquí reunidos hemos vivido estas realidades y compartimos análogo caudal de recuerdos."

de instrucción pública encarnarán estos principios de esencial igualdad humana", y lo que se ha establecido aquí son ciertos principios básicos y esenciales que tienen fuerza *ex proprio vigore,* pero que además de tener fuerza por su propio vigor habrán de requerir implementación de dos clases, educativa y jurídica. *En lo que toca a la educativa, ya hay aquí un mandato al sistema de instrucción pública que habrá de respetar estos básicos principios. En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país se subraya la inconstitucionalidad de todo favoritismo. Y todo reconocimiento a distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento. En lo que toca a qué es lo que se quiere decir con origen social, quiérese decir con origen social, que no importa la extracción de la persona, su situación económica, su condición en la comunidad, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico son iguales ante nuestras leyes si se aprueba esta disposición y cualquier intento de hacer discrimen en favor o en contra de una de ellas es ilegal.* (Énfasis suplido.) 2 Diario de Sesiones de la Convención Constituyente 1382 (1952).

En igual sentido, la Comisión de la Carta de Derechos consignó:

Sec. 1.—La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen social, ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.

El propósito de esta sección es fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. *La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño.* En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposi-

ción constitucional, a la vez que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto.

· · · · · · · ·

*Origen social.* Esta expresión reafirma el principio de descartar toda *gradación, favoritismo o prejuicio* al sopesar los méritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., por motivos de origen o condición social.

· · · · · · · ·

Sec. 5—Habrá un sistema de instrucción pública, el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela elemental y secundaria. No se utilizará propiedad ni fondos públicos para la enseñanza en otras escuelas o instituciones educativas que no sean las del estado. Nada de lo contenido en esta disposición impedirá que el estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez.

El establecimiento de un sistema de instrucción pública, libre y enteramente no sectario es una consecuencia natural de los postulados anteriores. La sociedad democrática tiene la obligación de proveer para que a las nuevas generaciones se les trasmita el conocimiento, los valores, las técnicas, las aptitudes que el continuado esfuerzo de siglos ha traducido en patrimonio de la vida civilizada. Ya en la primera sección se hacía referencia al sistema de instrucción pública para imponerle la responsabilidad de educar en los principios de esencial igualdad humana. Hay, desde luego, una íntima correspondencia entre la cultura y la ley. Las directrices vitales contenidas en una constitución derivan parte substancial de su eficacia del aprecio habitual en que las tiene la ciudadanía. La escuela pública ha sido una de las mayores fuerzas de democracia, de unidad colectiva y de oportunidad abierta al talento en la vida puertorriqueña. En su salón de clase se han educado codeándose hombres y mujeres de todas las clases sociales, de todas las religiones, de todos los grupos políticos, de todas las razas. En ella han aprendido la igualdad, la tolerancia, el esfuerzo. Debe continuar y ampliar esta su responsabilidad y trayectoria. (Énfasis suplido.) 4 Diario de Sesiones, *op. cit.*, págs. 2561, 2562 y 2564.

El inventario de este legajo es claro. En Puerto Rico, el derecho de educación y su real acceso no es simplemente un apéndice más incidental del derecho de "propiedad", únicamente protegido por los principios del debido proceso de ley. Es autónomo. Su sitial es alto en la escala de valores fundamentales comunitarios. En armonía con esta concepción, en *Pagán Hernández* v. *U.P.R.*, 107 D.P.R. 720, 738 (1978), caracterizamos la educación como un "derecho constitucional" revestido de gran importancia en la sociedad contemporánea.

La Universidad de Puerto Rico no está exenta de este derrotero. Hacerlo representa un retroceso en el avance alcanzado en nuestra sociedad. Su propia ley orgánica declaró:

> *debida fidelidad a los ideales de una sociedad integralmente democrática,* tiene como misión esencial alcanzar los siguientes objetivos, con los cuales es consustancial la más amplia libertad de cátedra y de investigación científica:
>
> . . . . . . . .
>
> (4) *Desarrollar a plenitud la riqueza intelectual y espiritual latente en nuestro pueblo, a fin de que los valores de la inteligencia y del espíritu de las personalidades excepcionales que surgen de todos sus sectores sociales, especialmente los menos favorecidos en recursos económicos, puedan ponerse al servicio de la sociedad puertorriqueña;*
>
> . . . . . . . .
>
> (6) *Tener presente que por su carácter de Universidad y por su identificación con los ideales de vida de Puerto Rico, ella está esencialmente vinculada a los valores e intereses de toda comunidad democrática.* (Énfasis suplido.) 18 L.P.R.A. sec. 601.

Este prisma legislativo pone en tela de juicio la validez del argumento, que encontró eco en el foro de instancia, de que por estar la escuela elemental adscrita a la U.P.R. no le aplican los postulados de *esencial igualdad humana* enunciados en la Constitución. Si algo revela su estatuto rector es el espíritu de proveer a los estudiantes de escasos recursos económicos las mejores oportunidades de estudio. El Legislador no se pro-

puso darle trato especial de tipo elitista al personal universitario al momento de crearla y abrir sus puertas.

## IV

Despejado el horizonte, en el caso de autos es detectable un derecho constitucional expreso y fundamental: la educación. Se impone pues, el análisis judicial de *escrutinio estricto* al evaluar la reglamentación en controversia sobre privilegios a los hijos de profesores, administradores y empleados en el cómputo de admisión. Este examen minucioso judicial tradicionalmente ha prevalecido para enfrentarnos a clasificaciones inherentemente sospechosas o cuando éstas afectan derechos fundamentales tangentes con la dignidad del ser humano, discrímenes por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosos y nacionalidad. *Alicea* v. *Córdova*, 117 D.P.R. 676 (1986); *León Rosario* v. *Torres*, 109 D.P.R. 804, 813 (1980); *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267, 277–278 (1975); *Wackenhut Corp.* v. *Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972).

Con este rigor jurídico nos inclinamos a estimar que estamos ante una clasificación que atenta directamente contra el mandato constitucional que proscribió toda gradación, favoritismo, gracia, privilegio al momento de ofrecerse la educación pública. La Asamblea Legislativa diáfanamente consagró el *mérito*, el *esfuerzo* y el *talento* como las cualidades que daban derecho al reconocimiento. La "extracción social" de la persona —hijo de profesor,(³) de administrador, o em-

---

(³) La duda sobre la validez del reglamento no sólo se refleja en el sistema de bonificación, sino también en la autoridad delegada al Rector en el procedimiento de admisión. El inciso (3) de la Parte I de las Normas de Admisión de la Escuela Elemental de la Universidad de Puerto Rico—Año 1986–87, establece que el Rector puede *ordenar* al Comité de Admisiones de la escuela que acepte, sin necesidad de evaluación alguna, al hijo de cualquier profesor visitante o miembro del claustro, siempre que "medie un interés institucional".

pleado universitario— no puede ser criterio válido constitu-
cional en el proceso de admisión a una escuela pública del
Estado o de una de sus instituciones. La autonomía univer-
sitaria tiene sus límites constitucionales.

No está en disputa, como muy bien apuntan los peticio-
narios, el derecho a estudiar en una escuela en particular. En
juego está un derecho de mayor envergadura: competir en
*igualdad de condiciones* por la educación pública del Estado
provista en un centro docente del país. Frente a un aparente
privilegio discriminatorio, la U.P.R. no ha demostrado la
existencia de un interés público apremiante o de superior je-
rarquía que la justifique o que tal clasificación sea la única
alternativa posible y razonable o la menos onerosa. *Zachry
International* v. *Tribunal Superior*, supra, págs. 277–278.

En el caso de *Bauza* v. *Morales Carrion*, 578 F.2d 447 (1er
Cir. 1978), citado por el tribunal de instancia con carácter
persuasivo y así invocado por la Universidad, el Tribunal Fe-
deral de Apelaciones para el Primer Circuito sostuvo la prác-
tica institucional que nos ocupa, por la ausencia de una clasi-
ficación sospechosa a un derecho fundamental a la educación.
Ese foro cautamente expresó: "En ausencia de una inter-
ferencia con un derecho fundamental, o de un impacto sobre
una clasificación sospechosa, el Tribunal de Distrito debió dar
deferencia considerable a la visión y política pública de los
oficiales del Estado Libre Asociado." (Traducción nuestra.)
Íd., pág. 451.

Este razonamiento no es aplicable al caso. El Tribunal
Federal de Apelaciones se basó en la Constitución de Estados
Unidos y no en la del Estado Libre Asociado. El análisis que
se impone es distinto. En el de autos es ineludible imprimir
validez y reconocimiento al mandato constitucional del carác-
ter fundamental del derecho a la educación.

Las únicas razones aducidas por la Universidad no supe-
ran la realidad expresada. Ésta reclama la validez de la
norma a base de que constituye un beneficio marginal impor-

tante para el reclutamiento y retención de profesores y demás funcionarios. No lo dudamos. Además, señala que le permite usar la escuela —que no forma parte del sistema de Instrucción Pública— como laboratorio en el cual se pueden ensayar y desarrollar mejores técnicas de enseñanza, para aquellos estudiantes de la Facultad de Pedagogía que son potencialmente futuros maestros en el país. La única relación entre este legítimo propósito y el sistema de puntuación lo explica así: "Compete a las autoridades académicas, respetuosamente sometemos, el decidir con qué población o perfil estudiantil se obtendrán efectivamente las condiciones óptimas de laboratorio para obtener los resultados deseados. En efecto, sometemos que las condiciones propicias de laboratorio que se requieren para el éxito del experimento dependen, en gran medida, en la admisión de un núcleo estudiantil proveniente de una homogénea filosofía educativa tal y como se logra si un grupo significativo de los estudiantes provienen de un núcleo familiar identificado con la filosofía educativa de la Universidad."

En cuanto al primer extremo, resulta difícil justificar el beneficio de puntuación para capacitar intelectualmente a un aspirante —aun considerado como análogo a los beneficios marginales económicos— cuando atenta contra la Ley Universitaria y la Constitución. Sencillamente en un gobierno de leyes, hay acciones que no son permisibles independientemente de sus buenos propósitos, si su implantación infringe principios elementales de mayor jerarquía.

Sobre el carácter de laboratorio de la escuela para futuros maestros, es dudosa la proposición de la U.P.R. predicada en que debe decidir y controlar la población o perfil estudiantil, para lograr las mejores condiciones de laboratorio y los resultados deseados a base de este privilegio. De ninguna manera nos ha adelantado o ha elaborado cómo ello logra ese objetivo. Tampoco que sea esencial. Presumiendo que la Universidad aspire a que la población estudiantil sea una muestra del mejor talento intelectual disponible y que de ese modo los estu-

diantes de la Facultad de Pedagogía tengan ese recurso, la regla de bonificación de cinco (5) puntos atenta y contradice dicho propósito. Por su operación y efectos descualificadores, impide el acceso a estudiantes mejor cualificados intelectualmente que aquellos que logran admisión por razón de la bonificación.

En resumen, de su faz la reglamentación aquí impugnada choca contra principios fundamentales de nuestra Constitución. Tiene fuertes indicios de ser injustificada y no lograr los propósitos que se han aducido en su apoyo.

En estas circunstancias y aplicados los criterios esbozados en *P.R. Telephone Co.* v. *Tribunal Superior*, 103 D.P.R. 200, 202 (1975), forzoso es concluir que los peticionarios tienen un caso con fuerte probabilidad de prevalecer en los méritos. Por otro lado, no surge perjuicio o el daño que sufriría la U.P.R. de permitírseles provisionalmente la matrícula. Si alguno, el perjuicio inmediato sería sufrido por los niños. [4] El balance de intereses y perjuicios a las partes, así como el interés público inclinan la balanza en esta etapa de los procedimientos *en favor del derecho a la educación* reclamada.

La negativa a expedir el recurso y paralizar los procedimientos es lamentable. Por primera vez en Puerto Rico el Poder Judicial refrenda una práctica elitista, en menosprecio de la dignidad e igualdad del ser humano, que desde el 1952 la Asamblea Constituyente rechazó expresamente.

---

[4] Existe la posibilidad de que la calificación de 79 puntos informada como mínimo a Roberto Alejandro incluya la bonificación de cinco (5) puntos (74 + 5) impugnada. Aun bajo este supuesto ello no favorece a la Universidad. Colocaría al niño en desventaja frente a otros que obtuvieron su misma calificación inicial de 74 puntos en las pruebas de admisión. De así establecerse en su día, se le privaría del derecho que le asiste y que diligentemente ha reclamado.

Para evitar ese perjuicio de graves consecuencias en su desarrollo académico, es preferible que se le admita a la Escuela Elemental con carácter condicionado.