Robert P. COYNE, Plaintiff,

v.

CITY OF SOMERVILLE,
et al., Defendants.

Civ. A. No. 89–1751–T.

United States District Court,
D. Massachusetts.

Aug. 27, 1991.

Joan A. Lukey, Hale & Dorr, Boston, Mass., for plaintiff.

John Christopher Foskett, Mary Jo Hollender, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Boston, Mass., for defendants.

Robert L. Farrell, Parker, Coulter, Daley & White, Boston, Mass., for defendants.

## ORDER

TAURO, District Judge.

 This court hereby ACCEPTS the Report and Recommendation of the Magistrate Judge. Plaintiff's complaint is, therefore, dismissed.

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS

May 8, 1991

LAWRENCE B. COHEN, United States Magistrate Judge.

Defendants' Motion to Dismiss (# 50) was referred to this court for report and recommendation pursuant to the provisions of Rule 3(a) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts.

In a nutshell, plaintiff generally contends that the defendants violated his civil rights within the meaning of 42 U.S.C. § 1983 on account of their failure to promote him to various administrative positions in the Somerville School system.[1]

### I. *The Parties*

Plaintiff, Robert P. Coyne ("Coyne"), is, and has been since 1969, employed within the Somerville school system as a high school teacher.

---

1. For want of diversity, subject matter jurisdiction is based on the provisions of 28 U.S.C. § 1343(3).

There are a number of state law claims which were brought as claims pendent to the civil rights claim.

Defendants in this action are 1) the City of Somerville ("Somerville"); 2) William Fasciano ("Fasciano"), the Director of Personnel and Assistant Superintendent of Somerville Schools—sued in both his official and individual capacities; 3) current members of the Somerville School Committee—specifically Patricia D. Jehlen, Maryann C. Cappello, Eugene C. Brune, Michael E. Capuano, Celia L. Courtney, Dorothy A.S. Gay, Stanley M. Koty, Jr., Julie A. DiPasquale, Paul L. Duhamel; 4) former members of the Somerville School Committee—specifically Dennis Mahoney, Charles Ciano, Mark Cronin, Harold Mollahan, Paul Dumas, Francis Bakey, Thomas August, Alan Kenney, Judith de la Paz, John Ciardi, Thomas Taylor, John Buonomo, Michael McKenna, Helen Corrigan; 5) Robert Watson ("Watson"), Superintendent of Somerville Schools through April of 1988; 6) Dr. John C. Davis ("Davis") Superintendent of Somerville Schools from 1988 to the present; and 7) John P. Joyce ("Joyce"), Assistant Superintendent of Somerville Schools through September of 1985.

## II. *The Factual Allegations*[2]

Plaintiff began employment in the Somerville school system in 1969, as a high school teacher.

At all relevant time periods, he was certified by the Massachusetts Department of Education in various fields, particularly in the fields of Special Subjects Supervisor in Health and Physical Education and General Supervisor. These certifications were and are in accordance with the requirements of Mass.Gen.Laws, Ch. 71 § 38G. Under the provisions of that statute, vacancies, including administrative or supervisory positions, must be filled by persons certified in accordance with those provisions.

In addition to the state statutory certification requirements, the Regulations of the Somerville Schools and the Rules of the School Committee, required candidates for teaching or supervisory positions to satisfy the state's certification requirements.[3]

Over the past decade, plaintiff applied for various supervisory/administrative positions. While he possessed the necessary certification, he never received a promotion. Meanwhile, other candidates, who did not possess the requisite certification, received promotions over plaintiff.

In 1979, plaintiff applied for the position of Building Master. Plaintiff was the only finalist for this position who possessed the requisite certification. Despite his certification, he was bypassed in favor of a non-certified candidate, John Nunziato. This position was reposted in 1982, after a brief abolition of the position. Again plaintiff was bypassed in favor of Nunziato who still lacked the requisite certification.

In or about 1985, plaintiff applied for the position of Department Head, Health and Physical Education Department. Of the three finalists, plaintiff was, again, the only candidate who possessed the requisite certification. And, again, plaintiff was bypassed, this time in favor of Gerald Knight, who, at the time of his appointment, did not possess the appropriate certification.

Plaintiff first learned that the Somerville School Committee had appointed administrators without the requisite certifications through a newspaper article published on September 27, 1988. Upon learning of the School Committee's practice, plaintiff informed Dr. John Davis, Superintendent of Schools, that he (plaintiff) felt aggrieved by the past practice.[4]

---

**2.** All references to the factual allegations are from plaintiff's Second Amended Complaint (# 48), and all factual allegations are deemed true for purposes of the motion to dismiss.

**3.** A labor contract between the Somerville School Committee and the union of which plaintiff was a member also specified that teachers would be assigned their areas of certification.

**4.** As a result, plaintiff, his union, and the School system engaged in attempts at grievances procedures. The grievance was eventually dismissed in January 1989 as being untimely.

Plaintiff does not raise a *procedural* due process claim. The factual allegations in the Second Amended Complaint concerning the aborted grievance procedure are accordingly irrelevant to the motion to dismiss currently before this court.

In 1989, plaintiff, in his third attempt at a promotion, applied for the position of Chairperson of the Physical Education and Health Department. Although plaintiff possessed the requisite certification, he was not even selected as a finalist on this occasion.[5]

### III. *The Claims*

Against this factual background, plaintiff makes the following claims against the various defendants:

A. *Federal Claims*

*Count I*, alleging violation of 42 U.S.C. § 1983, on equal protection grounds;

*Count II*, alleging violation of 42 U.S.C. § 1983, on substantive due process grounds;

*Count III*, alleging violation of 42 U.S.C. § 1983, on First Amendment grounds;

B. *Pendent State Law Claims*

*Count IV*, alleging violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H and 11I;

*Count V*, alleging breach of contract;

*Count VI*, alleging violation of implied covenant of good faith and fair dealing;

*Count VII*, alleging violation M.G.L. c. 71;

*Count VIII*, asserting equitable estoppel; and

*Count IX*, alleging intentional interference with advantageous relations.

### IV. *The Motion to Dismiss Standard*

In determining the merits of the motion to dismiss, this court assumes that all the material allegations set forth in the second amended complaint are true. *Jenkins v. McKeithen*, 395 U.S. 411, 421–422, 89 S.Ct. 1843, 1848–1849, 23 L.Ed.2d 404 (1969); *O'Brien v. DiGrazia*, 544 F.2d 543, 545 (1st Cir.1976); *denied sub nom O'Brien v. Jordan*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). The averments of the complaint, as well as the proper inferences arising from them, have been liberally construed in favor of the plaintiff, and dismissal is warranted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).[6]

### V. *The Federal Claims*

### A. Equal Protection—Count I

Simply put, plaintiff contends that defendants discriminated against him in violation of the equal protection clause—that is, that the conduct of the defendants constituted discriminatory conduct favoring one class, which plaintiff designates as a class consisting of "friends, cronies, and others in favorable relationships with decision-makers with the School System[,]" and discriminating against his class—*i.e.*, a class[7] consisting of persons who are *not* "friends, cronies, and others in favorable relationships with decision-makers with the School System[.]"

Claims of denial of equal protection of the laws can be divided into three categories—each supplying a different analysis.

---

**5.** With respect to each occasion where he was not granted the promotion, including this latter occasion where he was not even selected as a finalist, plaintiff, as detailed below, claims that the failure to promote constituted a violation of *substantive* due process and equal protection of the laws (Counts I and II).

With respect to this latter incident, however, plaintiff also contends that the failure to promote constituted a violation of his First Amendment rights (Count III). Specifically, he alleges that, after he had complained to various officials about his non-promotion on other occasions, defendant Fasciano "expressed to at least one other person in the Somerville School System that he, and others of like mind, would do everything in their power to insure that Coyne did not receive the June, 1989 appointment to the position of Chairperson of [the] Physical Education and Health Department." Second Amended Complaint (# 48, p. 16, ¶ 78).

**6.** Defendants have filed certain affidavits and deposition testimony in connection with their motion to dismiss. This court has not considered those materials within the context of this motion to dismiss.

**7.** "Class" may well be too broad a term since, at least to the extent set forth in the Second Amended Complaint, only two persons are identified as members thereof—plaintiff and one other person who was denied a promotion.

As set forth in *E & T Realty v. Strickland,* 830 F.2d 1107, 1112 n. 5 (11th Cir.1987)—

Equal protection claims can be divided into three broad categories. *See,* J. Nowak, R. Rotunda & J. Young, Constitutional Law 600 (2d ed. 1983). The first and most common type is a claim that a statute discriminates on its face. In such a case, a plaintiff can prevail by showing that there is no rational relationship between the statutory classification and a legitimate state goal. *Hooper [v. Bernalilo County Assessor ],* 472 U.S. [612] at 618, 105 S.Ct. [2862] at 2866, [86 L.Ed.2d 487 (1985)], *Dandridge [v. Williams ],* 397 U.S. [471] at 485–86, 90 S.Ct. [1153] at 1161–62 [25 L.Ed.2d 491 (1970)]. When the statute facially discriminates against certain groups or trenches upon certain fundamental interests, courts have required a closer connection between the statutory classification and the state purpose. *See generally Plyler v. Doe,* 457 U.S. 202, 216–18 & nn. 14–16, 102 S.Ct. 2382, 2394–95 & nn. 14–16, 72 L.Ed.2d 786 (1982) (plurality) (discussing "intermediate" and "strict" scrutiny).

The second type of equal protection claim is that neutral application of a facially neutral statute has a disparate impact. In such a case, a plaintiff must prove purposeful discrimination. *See, e.g., Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct.

2282, 60 L.Ed.2d 870 (1979); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

The third type of claim is that defendants are unequally administering a facially neutral statute. Plaintiffs' claim in this case falls into this third category.

 In the circumstances of this case, it is clear that plaintiff's claim falls within this third category—*i.e.,* that the defendants have unequally administered a facially neutral statute.[8] And on that, the test, the analysis, is quite clear (*Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944)—

The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of *intentional or purposeful discrimination.* This may appear on the face of the action taken with respect to a particular class or person, cf. *McFarland v. American Sugar Co.,* 241 U.S. 79, 86–7, [36 S.Ct. 498, 501, 60 L.Ed. 899], or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself, *Yick Wo v. Hopkins,* 118 U.S. 356, 373–4 [6 S.Ct. 1064, 1072–3, 30 L.Ed. 220][9] But a discriminatory purpose is

---

**8.** Plaintiff specifically disavows any suggestion that he belongs to a "suspect" class. Plaintiff's Opposition to Defendants' Motion to Dismiss (#53, p. 12).

**9.** Although the court did not further define the meaning of "discriminatory design", its reference to *Yick Wo* clearly intimates that "discriminatory design" falls closer to the mark of a "suspect class" analysis. In *Yick Wo,* of course, the evidence clearly and unequivocally showed that the ordinance in question was applied in one way to persons who were not members of the Chinese race, and quite differently to those who were of that race.

When the Court next revisited the issue of unequal enforcement of a facially neutral statute—and rejected the claim in the context of that case—the Court observed, with respect to the holding in *Yick Wo (Gundling v. Chicago,* 177 U.S. 183, 186, 20 S.Ct. 633, 635, 44 L.Ed. 725 (1900)—

The case principally relied upon by the plaintiff in error is that of *Yick Wo v. Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220], relating to the regulation of laundries in the city of San Francisco. The ordinance in question in that case was held to be illegal and in violation of the Fourteenth Amendment, because, with reference to the subject upon which it touched, it conferred upon the municipal authorities arbitrary power, at their will and without regard to discretion in the legal sense of the term, to give or withhold consent as to persons or places for carrying on a laundry, with reference to the competency of the persons applying or the propriety of the place selected. *It was also held that there was a clear and intentional discrimination made against the Chinese in the operation of the ordinance, which discrimination was founded upon the difference of race, and was wholly arbitrary and unjust.* It appeared that both petitioners, who were engaged in the

not presumed, *Tarrance v. Florida,* 188 U.S. 519, 520 [23 S.Ct. 402, 403, 47 L.Ed. 572]; there must be a showing of *"clear and intentional discrimination," Gundling v. Chicago,* 177 U.S. 183, 186 [20 S.Ct. 633, 635, 44 L.Ed. 725]; see *Ah Sin v. Wittman,* 198 U.S. 500, 507–8 [25 S.Ct. 756, 758–9, 49 L.Ed. 1142]; *Bailey v. Alabama,* 219 U.S. 219, 231 [31 S.Ct. 145, 147, 55 L.Ed. 191]. Thus the denial of equal protection by the exclusion of Negroes from a jury may be shown by extrinsic evidence of a purposeful discriminatory administration of a statute fair on its face. *Neal v. Delaware,* 103 U.S. 370, 394, 397 [26 L.Ed. 567]; *Norris v. Alabama,* 294 U.S. 587, 589 [55 S.Ct. 579, 580, 79 L.Ed. 1074]; *Pierre v. Louisiana,* 306 U.S. 354, 357 [59 S.Ct. 536, 538, 83 L.Ed. 757]; *Smith v. Texas,* 311 U.S. 128, 130–31 [61 S.Ct. 164, 165–66, 85 L.Ed. 84]; *Hill v. Texas,* 316 U.S. 400, 404 [62 S.Ct. 1159, 1161, 86 L.Ed. 1559]. But a mere showing that Negroes were not included in a particular jury is not enough; there must be a showing of actual discrimination because of race. *Virginia v. Rives,* 100 U.S. 313, 322–3 [25 L.Ed. 667]; *Martin v. Texas,* 200 U.S. 316, 320–1 [26 S.Ct. 338, 339, 50 L.Ed. 497]; *Thomas v. Texas,* 212 U.S. 278, 282 [29 S.Ct. 393, 394, 53 L.Ed. 512]; cf. *Williams v. Mississippi,* 170 U.S. 213, 225 [18 S.Ct. 583, 588, 42 L.Ed. 1012]. (Emphasis added).

So too in *Wayte v. United States,* 470 U.S. 598, 610, 105 S.Ct. 1524, 1532, 84 L.Ed.2d 547 (1984), the Court observing—

"Discriminatory purpose" ... implies more than ... intent as awareness of consequences. It implies that the deci-

sionmaker ... selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an *identifiable group."* [10] *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279 [99 S.Ct. 2282, 2296, 60 L.Ed.2d 870] (1979). (Emphasis added).

██ Plaintiff, in an effort to parry the position advanced by defendants, pretermits the "intentional or purposeful discrimination test—relying on the holding in *Bauza v. Morales Carrion,* 578 F.2d 447, 450 (1st Cir.1978). In this court's view, however, plaintiff misconstrues the rationale—not to mention the holding—in *Bauza.*

In that case, parents brought an action against school officials alleging that the school officials filled vacancies in a kindergarten class in violation of a published regulation. Specifically, the parents alleged that the school officials misapplied a regulation which called for selecting students by lot. Instead, favored status was given to those children whose parents were members of the faculty. To that extent, the facts in *Bauza* mirrors those brought here: In *Bauza,* plaintiffs alleged that a certain identifiable class [children whose parents were members of the faculty] were preferred—were given favored status—over another identifiable class [all other persons who were not children of parents who were members of the faculty]. Here, on the other hand, plaintiff defines the identifiable classes as stated above, that is, "friends, cronies, and others in favorable relationships with decision-makers with the School System[,]" on the one hand, and those persons who were *not* "friends, cro-

---

laundry business, were Chinese and had complied with every requisite deemed by the law, or by the public officers charged with its administration, necessary for the protection of neighboring property from fire or as a protection against injury to the public health, and yet the supervisors, for no reason other than discrimination against the Chinese, refused to grant the licenses to the petitioners and to some two hundred other Chinese subjects, while granting them to eighty people who were not such subjects and were working under precisely the same conditions. (Emphasis added).

10. In *Wayte,* involving a claim of selective prosecution for violations of the Selective Service laws, the petitioner failed to persuade the majority that he belonged to an identifiable group. The dissent disagreed—but only because the dissent defined that group as a group of vocal persons having common characteristics—*i.e.,* they all exercised their First Amendment rights in criticizing the government openly and defiantly by stating their intention not to register under the Selective Service laws.

So too in *Feeney* where the class consisted of all women.

nies, and others in favorable relationships with decision-makers with the School System[,]" on the other.

And in *Bauza*, the court rejected the equal protection claim, concluding (*Id.* at 451–52)—

> There must be "an element of intentional or purposeful discrimination" to transform the erroneous administration of a statute, fair on its face into a violation of the equal protection clause ... By "intentional or purposeful discrimination," the Supreme Court seemingly had in mind not the mere failure to apply a state rule, but some action that would amount to impermissible discrimination were it to be incorporated in and proclaimed by the statute itself.[11]

*Bauza*, at 451–52; *quoting, Snowden v. Hughes*, 321 U.S. 1, 8–9, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *see also, Dauel v. Bd. of Trustees of Elgin Community College*, 768 F.2d 128, 131 (7th Cir.1985) (Unequal enforcement of a facially neutral regulation is not unconstitutional unless inequality has some invidious purpose).

11. This latter test—*i.e.*, would the complained of conduct amount to "... impermissible discrimination were it to be incorporated in and proclaimed by the statute itself"—is a telling one. In the context of this particular case, the appropriate question would be: Could the legislature have written the statute [Mass.Gen.Laws, Ch. 71, § 38G] in discretionary—not mandatory terms? That is to say, could the legislature revise, or have revised, that statute and, although indicating its preference that only certified teachers fill school vacancies, also state that the matter was a discretionary one, absolute discretion being vested in the appropriate school officials. Plaintiff has offered no suggestion indicating that would be impermissive legislation when judged by the equal protection clause, and this court is unaware of any case or other authority suggesting otherwise.

12. And plaintiff does not contend that he could do so. In his memorandum in opposition to the motion to dismiss (# 53, pp. 12–13), plaintiff merely suggests that there was no rationale basis for that conduct. That is, however, far removed from an allegation of purposeful or intentional discrimination within the meaning of *Snowden, supra,* and *Bauza, supra.*

13. The United States Court of Appeals for this Circuit has observed that there are two approaches to the matter of *substantive* due pro-

In this case, plaintiff does not allege "intentional or purposeful discrimination" in his Second Amended Complaint. He simply alleges that the various defendants *favored* cronies. He does *not* allege that the defendants engaged in that conduct "in part 'because of,' not merely 'in spite of,' its adverse effects upon an *identifiable group." Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).[12]

This court accordingly recommends that the district judge dismiss Count I of the Second Amended Complaint, based, as it is, on a claim of denial of equal protection, for failure to state a claim upon which relief may be granted.

## B. Substantive Due Process—Count II

■ Suggesting that he—as a certified teacher—had a justifiable expectation in promotion to those positions for which he was passed over, plaintiff contends that he was denied substantive due process.[13]

cess (*Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir. 1991)—

> The Supreme Court has enunciated two alternative tests by which substantive due process is examined. Under the first theory, it is not required that the plaintiffs prove a violation of a specific liberty or property interest; however, the state's conduct must be such that it "shocks the conscience." *See Rochin [v. California]* 342 U.S. [165] at 172, 173 [72 S.Ct. 205 at 209, 210, 96 L.Ed. 183 (1952)]. To succeed under the second theory, a plaintiff must demonstrate a violation of an identified liberty or property interest protected by the due process clause. See *Meyer v. Nebraska*, 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923); see also *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 [103 S.Ct. 2979, 2983, 77 L.Ed.2d 605] (1983) (state must provide medical care to persons with serious medical needs while in state custody); *Youngberg v. Romeo*, 457 U.S. 307, 315, 319 [102 S.Ct. 2452, 2457, 2459, 73 L.Ed.2d 28] (1982) (individual committed to a state institution has a protected liberty interest in receiving reasonably safe living conditions and freedom from unreasonable bodily restraints); *Ingraham v. Wright*, 430 U.S. 651, 673 [97 S.Ct. 1401, 1413, 51 L.Ed.2d 711] (1977) (corporal punishment of a student inflicted by a public school teacher violates substantive due process); *Landrigan v. Warwick*, 628 F.2d 736, 741–42 (1st Cir. 1980) (substantive due process implicated

In the circumstances, this court finds and concludes that plaintiff has not alleged the sort of property/liberty interest to which *substantive* due process attaches.

In suggesting that he was denied substantive due process, plaintiff points to such authorities as *Williams v. City of Boston*, 784 F.2d 430 (1st Cir.1986), *Burns v. Sullivan*, 619 F.2d 99 (1st Cir.1980), and *Edinger v. Board of Regents of Morehead State University*, 906 F.2d 1136, 1140 (6th Cir.1990). Those authorities, however, focussed on *procedural*—not *substantive*—due process.

■ Not every property interest is entitled to the protection of *substantive* due process. While a property interest created under state law will receive the protections of procedural due process, only those property rights derived under the Constitution receive the protections of substantive due process. *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985) (Justice Powell, concurring).

In *Ewing*, the Supreme Court accepted a University's invitation to "assume the existence of a constitutionally protectible property right in [a student's] continued enrollment". *Id.*, at 223, 106 S.Ct. at 512. Nonetheless the Supreme Court held that "even assuming the substantive due process clause gave the student a property interest in continued enrollment free from arbitrary state action, the facts of record disclose no such action." *Id.* However, Justice Powell, in his concurring opinion, found it unnecessary to assume the existence of a substantive due process property right.

Even if one assumes the existence of a property right, however, not every such right is entitled to the protection of substantive due process. While property interests are protected by procedural due

process even though the interest is derived from state law rather than the Constitution, *Board of Regents v. Roth*, 408 U.S. 564, 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548] (1972), substantive due process rights are created only by the Constitution ... "Each new claim to [substantive due process] protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically developed." *Poe v. Ullman*, 367 U.S. 497, 544, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).

That same analysis has been echoed by the United States Court of Appeals for this Circuit—

Under the second theory of substantive due process, plaintiffs must establish that the alleged threats made by the police officers to the Pittsleys violated a *specific constitutional* guarantee or liberty interest protected by the substantive due process clause.

*Pittsley, supra,* at 7 (Emphasis added).

The property interest asserted by Coyne, an interest in a promotion allegedly derived from state statute and contract, is, at bottom, a right weaved from the cloth of state law. It does not possess a significant resemblance to those interests previously viewed as fundamental by the Constitution.

■ The substantive Due Process Clause affords only those interests "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 2341, 105 L.Ed.2d 91 (1989); *quoting Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). Fundamental interests, protected by substantive due process, have been found in such restrictive areas as marriage, procreation, and family life. *Harrah Independent School Dist. v. Martin*, 440 U.S. 194, 198–

---

where a policeman uses excessive force in the apprehension of a suspect).

In this case, plaintiffs frame the issue as follows (Plaintiff's Opposition to Defendants' Motion to Dismiss [# 53], p. 21)—

In sum, the issue of whether Coyne has stated an actionable § 1983 claim relating to his due process rights turns on the following:

Whether he had a legitimate expectation of promotion, which promotion was defeated by the conduct of the defendants.

Plaintiff accordingly does not suggest the first alternative—the shock the conscience of the court analysis—but rests entirely on a claim that the defendants improperly interfered with a property/liberty interest.

9, 99 S.Ct. 1062, 1064–5, 59 L.Ed.2d 248 (1979) (per curiam).

Relying on the Fourteenth Amendment's protection of the "substantive aspects of life, liberty, and property," the Court of Appeals held, apparently, that the School Board's decision to substitute the sanction of contract nonrenewal for the sanction of withholding routine pay increases was so "arbitrary" that it offended "notions of fairness" generally embodied in the Due Process Clause. Here, however, there is no claim that the interest entitled to protection as a matter of substantive due process was anything resembling "the individual's *freedom of choice with respect to certain basic matters of procreation, marriage, and family life.*" (Emphasis added) (citations omitted).

*Id.*

In this case, plaintiff simply does not allege—nor can he show—the sort of property/liberty interest to which *substantive* due process attaches.

Unlike matters of procreation, marriage, and family life, plaintiff simply alleges that he was denied a *promotion* to such positions as Building Master, Department Head, Health and Physical Education Department, and Chairperson of the Physical Education and Health Department. That is hardly the sort of right—property and/or liberty—to which any court has attached the substantive due process clause.

In arguing to the contrary, plaintiff (Plaintiff's Opposition to Defendants' Motion to Dismiss [# 53, pp. 13–21]) points to certain tenure cases as support for his claim. But putting to one side the fact that the cases cited address matters of *procedural*—not *substantive*—due process, *see* p. 13, *supra*, there is a clear, and practical, difference between tenure, on the one hand, and failure to promote to such positions as Building Master, Department Head, Health and Physical Education Department, and Chairperson of the Physical Education and Health Department, on the other. The denial of tenure—as a practical matter—is the functional equivalent of a discharge. That is because tenure—in the university academic environment—insures continued employment.[14] The same can be hardly said about that which plaintiff sought. He has been employed as a teacher in the Somerville school system since 1969, and the denial of his applications for additional administrative or supervisory positions has not affected, in the slightest, his continued employment in that school system.

And nothing is added to plaintiff's substantive due process claim by pointing to state law, local law, or union agreements, all of which embody the notion that only certified teachers should be promoted or fill established vacancies.

In *Beitzell v. Jeffrey*, 643 F.2d 870 (1st Cir.1981), an assistant professor who was denied tenure brought a civil rights action pursuant to § 1983. Like plaintiff here, the assistant professor argued that he had a property right in a promotion to the position of tenured professor because he alleged he satisfied the University's promulgated criteria for an award of tenure. The

---

**14.** This case is clearly distinguishable from *Newman v. Com. of Mass.*, 884 F.2d 19, 25 (1st Cir.1989).

In that case, a *tenured* professor at the University of Massachusetts was accused of plagiarizing an article, and was thereafter censored. Drawing upon earlier cases involving *nonrenewal* of public employment contracts, the Court observed (884 F.2d at 25 n. 4)—

Although *Drown [v. Portsmouth School Dist.*, 451 F.2d 1106 (1st Cir.1971) ] and *McEnteggart [v. Cataldo*, 451 F.2d 1109 (1st Cir. 1971) ] specifically concerned the loss of jobs through nonrenewal of contracts, we believe the principle established in those cases clearly is applicable to other types of employment actions that *substantially damage an employ-*

*ee's property interest in her job.* In this case, plaintiff was barred from voting on degrees and from serving on important university committees or as chair of her department. A letter of censure for an act of "objective plagiarism" and "seriously negligent scholarship" was placed in her permanent file, an action that undoubtedly affects her ability to secure other employment in the future. We think it obvious that this severe sanction substantially damaged plaintiff's property interest in her position.

In this case, plaintiff clearly has not alleged that he was censored, that he would lose his current teaching position, or that the failure to promote would "undoubtedly" preclude him from securing other employment in the future.

First Circuit held that in failing to provide him with tenure, the university did not deprive him of "property" within the meaning of the Fourteenth Amendment. The Court held:

> The government often promulgates criteria for selecting among applications for a particular job, but that fact alone does not create an automatic right in the applicant to the job, nor does it create an entitlement, or a property interest, in a job not yet possessed.

*Id.*, at 876.[15] Plaintiff is asserting a property interest in a job not yet possessed. Like the assistant professor in *Beitzell*, the mere fact that Massachusetts promulgated criteria which Coyne satisfied, *i.e.*, certification requirements, for the promotion does not create a right to the promotion, and does not create a property interest in it.

■ Plaintiff further contends that defendants breached statutory and contract law when they promoted non-certified persons, over Coyne who possessed the requisite certification. Assuming this breach of statutory, regulatory, and contract law, this still does not raise plaintiff's injury to the level of a property interest protected by substantive due process. Violations of state statutes and contracts does not offend substantive due process.

In *Boston Env. Sanitation Inspectors Ass'n v. Boston*, 794 F.2d 12 (1st Cir.1986), a city employees' union alleged that the city of Boston was promoting individuals for reasons of political patronage in violation of state statutes. The First Circuit affirmed the dismissal of the § 1983 action maintaining that the mere violation of state statutes and labor contracts could not form the basis of a § 1983 action. While *Boston Env. Sanitation Inspectors Ass'n.* initially affirmed this dismissal on procedural due process grounds, the Court added:

> Furthermore, appellants' claims that appellees breached state statutory provisions and applicable labor contracts cannot form the basis of a § 1983 action. Mere violation of state statutory requirements does not offend *federal* constitutional due process.

*Id.*, at 13 (emphasis supplied).[16]

Again in *Chiplin Enterprises v. City of Lebanon*, 712 F.2d 1524, 1527 (1st Cir. 1983), the Court observed, "it is axiomatic that not every violation of a state statute amounts to an infringement of constitutional rights."[17]

So too with the matter of a breach of the union contract.

In *Packish v. McMurtrie*, 697 F.2d 23 (1st Cir.1983), school employees brought a § 1983 action alleging a violation of their substantive due process rights. The school employees alleged the defendants denied them their property rights when defendants breached their employment contracts. Affirming the District Court's dismissal, the Court held—

> This situation is analogous to that which sometimes arises in *public employment* cases. In that context we have pointed out that "a mere breach of a contractual right is not a deprivation of property without constitutional due process of law. Otherwise, virtually every controversy involving an alleged breach of contract by a government ... instrumentality would be a constitutional case." *Jimenez v. Almodovar*, 650 F.2d 363, 370 (1st Cir.1981) (emphasis in original) (citation omitted). *Cf. Casey v. Depetrillo*, 697 F.2d 22 (1st Cir.1983) (dismissal for failure to state a claim of section 1983 action alleging that state had taken plaintiffs' property without due process by breaching their employment contracts).
>
> And that, of course, is precisely this case—a *public employment* case.

---

15. *Beitzell* was a *procedural* due process case. It goes without saying that if one cannot make out the sort of property and/or liberty interest to which *procedural* due process attaches, one cannot make out a claim for *substantive* due process.

16. Again a *procedural* due process case. *See* footnote 15, *supra.*

17. *Chiplin* is consistent with a long line of cases holding that misapplication of zoning statutes or other statutes regulating land use do not implicate substantive due process claims. *See e.g., PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28 (1st Cir.1991); *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822 (1st Cir.1982).

It cannot be fairly said that the land use cases are sui generis. To the contrary, the Court noted in *Chiplin, supra,* at 1527 n. 4—

The plaintiffs have failed to state a claim for relief under federal law. In *Jimenez v. Almodovar*, 650 F.2d 363, 370 (1st Cir.1981), we held that a "mere breach of contractual right is not a deprivation of property without *constitutional* due process of law ... Otherwise, virtually every controversy involving an alleged breach of contract by a government or a governmental institution or agency or instrumentality would be a constitutional case."

*Id.*, at 23. *Packish* demonstrates that mere breach of a contract does not implicate a property deprivation in violation of substantive due process. *See also Bleeker v. Dukakis*, 665 F.2d 401 (1st Cir.1981).

In short, plaintiff has not identified the sort of property or liberty interest to which substantive due process attaches. This court accordingly recommends that the district judge dismiss Count II of the Second Amended Complaint.

### C. First Amendment Claim—Count III

In Count III, plaintiff alleges that, in retaliation for his challenges to defendants' practice of promoting noncertified individuals into administrative positions, he was not promoted in 1989 to the position of Chairperson of Physical Education and Health Department. This, plaintiff says, violated his First Amendment right to free speech.

While plaintiff has no "right" to a promotion, *see* Part V.B, *supra*, pp. 746–750, this court assumes, for purposes of the motion to dismiss, that a failure to promote on account of the exercise of First Amendment right to free *speech* is functionally equivalent to a discharge based on such conduct, *see Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1986). The government may not prohibit his promotion on a basis that infringes on Coyne's freedom of speech.[18]

While it is clearly established law that a state may not discharge [or decline to promote] an employee for a reason that intrudes upon the employee's First Amendment rights to free speech, *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1986); *Rutan v. Republican Party of Illinois*, —— U.S. ——, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), it must first be determined whether plaintiff can show that he was engaged in *constitutionally* protected speech. In determining whether a public employee has engaged in constitutionally protected speech, courts must employ the balancing test articulated in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). The *Pickering* balancing test entails striking a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2896; *quoting Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–5.

In order for plaintiff to succeed on his retaliation claim, he must, as a preliminary matter, demonstrate that his speech was protected by the First Amendment under the standards set forth in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).[19]

---

**18.** In *Rutan v. Republican Party of Illinois*, —— U.S. ——, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the Supreme Court unequivocally held that a failure to *promote* public employees who are not policymakers on account of the exercise of the First Amendment right of *association* impermissibly infringes upon the First Amendment.

No reasonable distinction can be drawn between the First Amendment values of free *speech* and free *association*. This court accordingly concludes that—assuming that plaintiff's so-called speech is the sort of speech protected by the First Amendment—it would be as much a violation of the First Amendment to deny him his promotion.

**19.** Additionally, of course, plaintiff must show that the exercise of free speech was a " 'substantial factor'—or to put it in other words, that it was a 'motivating factor' in the Board's decision not to [promote] him." *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (footnote omitted).

Although the merits of the claim are not decided by this court, it is readily apparent that plaintiff faces a very difficult burden of establishing that his speech—whatever that speech may have been—was a "substantial factor" or a "motivating factor" in the decision not to promote. Indeed, plaintiff's own pleadings suggest to the contrary. He alleges that the relevant

In *Pickering*, a teacher, in a letter to a newspaper, criticized the Board of Education's allocation of school funds. The teacher alleged the superintendent's methods of disclosure prevented the public from knowing the real reasons why additional tax revenues were needed for the schools. The teacher was dismissed for this public criticism. In response to the teacher's First Amendment challenge, the Supreme Court determined that the teacher's speech was a legitimate matter of public concern. *Id.*, at 571, 88 S.Ct. at 1736.

There is, of course, a difference between speech on a matter of public concern and speech on a matter of personal interest. That was made clear in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1982), where an Assistant District Attorney wrote and distributed a questionnaire concerning office morale. The Assistant District Attorney was terminated for creating a "mini-insurrection." *Id.*, at 141, 103 S.Ct. at 1687.

In rejecting the First Amendment claim in that case, the Court observed, *inter alia*—

> Our task, as we defined it in *Pickering* is to seek "a balance between the interests of the [employee], *as a citizen*, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."
>
> \* \* \* \* \* \*
>
> The repeated emphasis in *Pickering* on the right of a public employee "as a *citizen*, in commenting upon matters of public concern," was not accidental.
>
> \* \* \* \* \* \*

Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. In this case, with but one exception,[20] the questions posed by Myers to her co-workers do not fall under the rubric of matters of "public concern." We view the questions pertaining to the confidence and trust that Myers' co-workers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section of the criminal court. Unlike the dissent, *post*, at 163 [103 S.Ct. at 1698], we do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official. *Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others.* Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the facts of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre. To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a

---

school officials, on a number of occasions prior to the 1989 posting, bypassed his application in favor of "cronies" or other friends. Indeed, plaintiff alleges that this favoritism pervaded the promotional process. This, in turn, comes perilously close to belying the suggestion that free speech was the reason for the denial again in 1989.

**20.** The one exception which the Court determined to be a matter of public concern related to an inquiry as to whether other assistant district attorneys "ever feel pressured to work in political campaigns on behalf of office supported candidates."

Even then, however, the Court determined that, on balance, the employer's action was justified.

constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

\* \* \* \* \* \*

We hold only that when a public employee speaks not as a citizen upon matters of public concern, *but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.* (Emphasis added).

 In the circumstances of this case, when tested against the tripartite analysis of "content, form, and context" of the statements now claimed to have been made in the exercise of free speech, plaintiff simply has not made out a showing that his statements were a matter of *public concern.*[21]

1. *Context*—In his memorandum in opposition (# 53, p. 22), and in an affidavit (# 54, pp. 3–5),[22] plaintiff points to some four writings which he says constituted protected speech.[23]

In terms of *context,* nothing proffered by plaintiff even remotely suggests that the writings were intended to voice matters of public concern. After all, this was not an instance where plaintiff, "as a citizen," intended to go public for the first time. Quite to the contrary, as specifically pleaded by (Second Amended Complaint, ¶¶ 50–53), the whistle on the very subject had already been blown—and it had received wide scale press coverage.[24] Indeed, it was solely on account of the fact that the matter had already been spread upon the public record that plaintiff learned that he may have been bypassed in favor of non-certified personnel. (Second Amended Complaint, ¶ 51).

2. *Content and Form*—Likewise, nothing in the four writings to which plaintiff points, in terms of *content* or *form,* suggests an exercise of First Amendment rights by a citizen who just happened to be a public employee.

In the first of those writings (Exhibit C to the Affidavit), he sent a letter to the John Davis, the Superintendent of Schools, who is a defendant in this case. He said nothing about matters of public concern. His message was plain and simple. He intended to *sue* the Somerville School Department—nothing more, and nothing less.

The second letter (Exhibit D to the Affidavit) was just more of the same—differing only because it was penned by counsel for plaintiff. Nothing was said concerning matters of public concern. It was intended to "protect[ ] [plaintiff's] legal rights relating to the promotional practices of the Somerville School Committee over the past several years." And it concluded with the

---

**21.** And, for that reason, there is no occasion to determine whether, if the statements were otherwise protected, that the action of the school system was nevertheless, on balance, an appropriate response. That issue need not be reached unless, and until, there has been showing that the statements in issue consisted of matters of public concern.

**22.** Defendants have moved to strike the affidavit. This court looks at the affidavit solely for the purpose of determining whether plaintiff can prove any set of facts which would support his First Amendment claim.

Additionally, this court assumes, for purposes of the motion to dismiss, that the remarks attributed to defendant Fasciano, *see* footnote 5, *supra,* evidence motivation on his part to deny plaintiff a promotion on account of the communications referred to in this section.

**23.** In the memorandum in opposition (# 53, p. 22), he identifies those writings as Exhibits D through I to his affidavit. In fact, as an attachment to the affidavit, they are Exhibits C through G. They were previously designated Exhibits D through I as an attachment to plaintiffs' Amended Complaint (# 25).

**24.** According to the allegations in the Second Amended Complaint, the matter had become a matter of public record when a co-worker, one Kathy Skinner, was denied an application for a vacancy, and filed a grievance. The fact that the Somerville school system was not following the appropriate procedures was acknowledged by officials of that school system, and that fact was heralded in the press.

customary demand for appropriate relief in lieu of litigation and, of course, a prayer for attorneys' fees.

The third letter (Exhibit E to the Affidavit) was not even plaintiff's communication. It was authored by one Mary Lewis, the Grievance Chairperson of the union [Somerville Teachers' Association] of which plaintiff was a member, and mailed to the Superintendent of Schools.

The fourth (Exhibit F to the Affidavit), again, was not plaintiff's communication. It was prepared by counsel for the school committee, and was mailed to counsel for plaintiff.

And the last (Exhibit G to the Affidavit) was another letter prepared by plaintiff and sent to the Superintendent of Schools. It said nothing about matters of public concern—it focussed exclusively on whether his claim was one properly subject to grievance. No mention was made whatsoever on the only issue of public concern—the issue previously spread upon the public record.[25]

In this court's view, all of the communications, all of the conduct, which plaintiff suggests was and is protected by the First Amendment, in context, in form, and in content, were nothing more than matters of *personal*—not *public*—concern. Here, as in *Connick, supra*, plaintiff did not seek to inform the public, or, indeed, even threaten to inform the public, about a matter of public concern. And here, as in *Connick*, plaintiff did not threaten to bring to light any actual or potential breach of public trust or wrongdoing. His messages in his missives were short and to the point, and directed solely to those who he now claims to be wrongdoers. The message—promote or face suit. Nothing more, and nothing less.

Plaintiff clearly fails to state any First Amendment claim, and this court accordingly recommends that Count III be dismissed.[26]

VI. *The Pendent State Law Claims*

In the circumstances, this court recommending that the claims brought under Section 1983 be dismissed, this is an appropriate case not to exercise pendent jurisdiction, and in which to dismiss the pendent state law claims without prejudice to refiling in the state courts. On the matter of pendent jurisdiction, the Supreme Court has indicated (*Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 and n. 7, 108 S.Ct. 614, 618 and n. 7, 98 L.Ed.2d 720 (1988))—

Under [*United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ], a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain,* the federal court should decline the exercise of jurisdiction by dismissing the case

---

**25.** A carbon copy of this letter was directed to the Chairman of the Grievance Committee, plaintiff's counsel, and to the Somerville Teachers' Association Committee on Professional Rights and Responsibilities. That letter, however, was drafted on or about December 30, 1988, well after the press had already reported the practice of filling vacancies with non-certified personnel, and well after the Somerville Teachers' Association had already joined forces with plaintiff in his bid to fill a vacancy.

**26.** Defendants, in their individual capacities, contend that they are qualifiedly immune from damages. That contention, however, does not go to so much of plaintiff's claim as he seeks injunctive relief.

In any event, inasmuch as this court concludes that plaintiff fails to state a claim under § 1983, there is no occasion to discuss the matter of qualified immunity at any length. Suffice to say that, for the reasons set forth in the text concerning plaintiff's failure to state a claim for relief under § 1983, it is highly unlikely that plaintiff could establish that defendants' conduct "violate[d] *clearly established* statutory or constitutional rights of which a reasonable person would have known." *See e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Boyle v. Burke*, 925 F.2d 497 (1st Cir.1991); *Feliciano–Angulo v. Rivera–Cruz*, 858 F.2d 40, 44 (1st Cir.1988).

without prejudice ..... in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims. (Emphasis added).

In this case, the state courts are best suited to resolve plaintiff's state law claims. Indeed, plaintiff contends, among other things (Second Amended Complaint, ¶¶ 90–92), that he has an implied right of action under Mass.Gen.Laws, Ch. 71, § 38G, on account of defendants' failure to heed the mandate of the legislature in filling vacancies with non-certified personnel. That appears to be a question of first impression[27]—one which should properly be resolved, in the first instance, in the state courts which are charged with the responsibility of interpreting the intent of the legislature.

VII. This court accordingly recommends[28] that the district judge dismiss Counts I, II, and III of the Second Amended Complaint for failure to state a claim upon which relief may be granted, and to dismiss the remaining pendent state law claims without prejudice to refiling in the appropriate state courts.

---

27. Plaintiff contends (Memorandum in Opposition, p. 28) that he has standing to raise the issue, citing Mass.Gen.Laws, Ch. 71, § 43A, and *Assad v. Berlin–Boylston Regional School Committee*, 406 Mass. 649, 550 N.E.2d 357 (1990); *Rantz v. School Committee of Peabody*, 396 Mass. 383, 486 N.E.2d 44 (1985); *Coco v. School Committee of Boylston*, 392 Mass. 221, 466 N.E.2d 118 (1984).

The statute [Mass.Gen.Laws, Ch. 71, § 43A], however, relates to demotions or discharges—*not* failures to promote. And the cited cases relate to the rights of demoted and/or discharged tenured teachers and/or principals, or the reduction of salaries of teachers and/or principals. None of the cases relate to the failure to promote, and none discuss whether an implied right of action lies under § 38G.

28. The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this rule shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir.1988); *United States v. Emiliano Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); see also, *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).